UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SEAN FINN, as the assignee of EXCEL IMAGING SERVICES, LLC, §§§<br>Plaintiff, §§<br>v. §§<br>PATRICK DOYLE, individually and d/b/a MEDIAL EXPORTERS AND MEDICAL EXPORTERS, LLC. §§§§<br>Defendants, § | Civil Action No. 4:17-CV-000036 |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

**Sean Finn as the assignee of Excel Imaging Services, L.L.C.** (hereinafter referred to as **"Excel" and/or "Plaintiff"**) **Plaintiff**, files this Plaintiff's First Amended Complaint against Defendants **Patrick Doyle, individually and d/b/a Medical Exporters** (hereinafter referred to as "**Doyle"**) and **Medical Exporters, L.L.C.** (hereinafter referred to as "**Medical Exporters**") **Defendants** and allege as follows:

### I. Parties

1. **Sean Finn, as the assignee of Excel Imaging Services, L.L.C** is an individual resident of Harris County, Texas.

2. Defendant **Patrick Doyle, individually and d/b/a Medical Exporters** is an individual resident of Tennessee, who has already appeared in this case. No additional service is necessary at this time.

3. Defendant **Medical Exporters, L.L.C.** is a Tennessee limited liability company that has its principal place of business in the State of Tennessee. **Medical Exporters, L.L.C.** does not have a registered agent for service of process in the State of Texas. Service of process has been made according to the laws of the State of Texas by serving **Medical Exporters, L.L.C.** by and through the Texas Secretary of State.

1

**Medical Exporters, L.L.C.** has already appeared in this case.

## II. Jurisdiction and Venue

4. This Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Excel and Doyle and Medical Exporters (hereinafter referred to as "Defendants") are citizens of different U.S. states and the amount in controversy exceeds $75,000.00, excluding interest and costs. This Court has personal jurisdiction over the Excel and Defendants as they conduct business in the State of Texas.

5. Excel's causes of action arise out of or relate to Defendants' contacts with Texas, or alternatively, and without waiving the foregoing, Defendants have continuous and systematic contacts with the State of Texas and this Court's assumption of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process. The non-resident Defendants purposely established minimum contacts with Texas and have been conducting business in the State of Texas. Defendants performed and/or were required to perform contracts in whole or in part in the State of Texas and derived substantial revenue from Defendants' activities in Texas. Additionally, Defendants were engaged in the selling, purchasing, financing and/or delivering of medical diagnostic equipment with and/or to the residents of the State of Texas. Additionally, there is a substantial connection between Defendants and the state of Texas arising from action and/or conduct of Defendants purposefully directed toward the Texas. Additionally, Defendants committed torts in whole or in part in the State of Texas. Defendants met with Excel in Houston Texas and made representations to Excel in Houston Texas as further set forth in this Amended Complaint. Defendants had substantial communications, emails and business deals with Excel and others in the State of Texas and Houston Texas. At all times, the place of performance for the delivery of payment was Houston Texas. Excel incorporates the additional facts as more fully described in this Amended Complaint.

6.      Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District. Excel incorporates facts in paragraph 5 above as these facts were committed in this District. Excel also incorporates the Paragraph VII "Facts" set forth in this pleading which contains facts that supports venue in this District. Defendants had continuous, systematic and substantial communications, emails directed to this District. Substantial funds were transferred from this District based on the actions and conduct of Defendants. Additionally, the majority of the witnesses that will testify for Excel in the trial of this matter reside in this District.

### III. Conditions Precedent

7.      All conditions precedent necessary to maintain this action have been performed and/or have occurred.

### IV. Fraudulent Concealment

8.      At all times hereto, the facts and causes of action made the basis of this lawsuit were fraudulently concealed from Excel by Defendants.

### V. Agency

9.      Whenever in this Complaint it is alleged that Defendants did any act or thing, it is meant that their subsidiaries, officers, agents, servants, employees and/or representatives did such act or thing and at the time such act or thing was done, it was done with full authorization or ratification of Defendants and was done in the normal and routine course and scope of employment of Defendants' subsidiaries, officers, agents, servants, employees and/or representatives.

10.     Medical Exporters is estopped from denying the agency of Doyle due to the apparent, ostensible and/or actual agency of Doyle.

11.     Through the theories of legal vicarious liability and respondeat superior Medical Exporters is liable to Excel under the facts as set out herein as at certain times material herein, Doyle was an employee,

agent and/or servant of Medical Exporters acting in the course and scope of his employment, agency or servant relationship for and on behalf of Medical Exporters.

12. Doyle, individually, conducted business under the assumed name and/or trade name of "Medical Exporters".

13. Sean Finn ("Finn") was a representative and agent of Excel.

14. Excel has assigned to Sean Finn all claims, causes of action, damages, rights, and interests which Excel may have against Doyle and Medical Exporters arising out of Doyle and Medical Exporters' conduct and failure to pay monies due to Excel as set forth in this lawsuit. Excel has standing and capacity to file this lawsuit.

## VI. Corporate Veil Piercing and Alter Ego

15. Upon information and belief, Doyle and Medical Exporters the alter ego of each other and are in substance one and the same.

16. Medical Exporters operated out of Doyle's home.

17. Doyle is the sole shareholder, salesperson, officer, director, manager and/or employee of Medical Exporters.

18. Upon information and belief, as set forth below, Doyle and/or Medical Exporters diverted assets and/or monies to the detriment of Excel.

19. Upon information and belief, Doyle has used Medical Exporters to be used to achieve an inequitable result and Doyle has abused the corporate form to promote fraud or injustice.

20. Medical Exporters acts as a conduit to carry on Doyle's personal business (an unfair device to achieve an inequitable result). Doyle must not be allowed to use corporate veils and is personally liable for all the wrongs committed by himself and Medical Exporters.

21.     This Court should disregard the corporate entity and hold Doyle personally liable for Medical Exporter's obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice.

## VII.  Facts

22.     Finn has been a Texas resident since 2000 and since that time, he has been in the business of buying and selling of medical diagnostic equipment.

23.     Some years ago, Finn established WPEF, LLC. ("WPEF").  Finn owned 100% of WPEF and it was in the business of buying and selling medical diagnostic equipment.  Between 2012 and 2015, WPEF had an office in Houston Texas. WPEF conducted business in Texas and in several other states. Between 2012 and 2015, WPEF had a bank account at Bank of America in Houston, Texas.

24.     In or about 2011, Finn desired to bring in a family member and a friend into the medical diagnostic equipment business.  Sometime during 2011, Excel was formed in Oklahoma.  The principals of Excel are Finn, Finn's brother Shannon Finn and Larry Smith. Each became a one-third owner.  Finn is the President of Excel.  Excel is also in the business of buying and selling of medical diagnostic equipment.

25.     Excel does business in Texas and several other states.  Excel had an office in Houston, Texas and at least from May 2012 to the present date, Finn conducts business on behalf of Excel from this Houston office (the "Houston Office").   Excel does not have a physical office in Oklahoma.

26.     Between May 2012 and February 2015, Excel and/or WPEF had medical diagnostic equipment for sale in Texas and other states and had the financial ability to purchase substantial amounts of medical diagnostic equipment.

27.     Doyle has been in the business of buying and selling of medical diagnostic equipment.

28.     Starting in or about 2010, Doyle began contacting Finn on a regular basis at the Houston Office trying to solicit business.  In 2010 and 2011, Doyle called Finn at least 25 times trying to solicit business.

5

29. In early 2012 Doyle solicited Finn at the Houston Office advising that Doyle had set up Medical Exporters and was looking for ways to make money in the medical diagnostic equipment industry.

30. From May 2012 and continuing through February 2015 Defendants and Finn on behalf of Excel and WPEF conducted numerous business deals together. There were at least 50 deals completed during that time. The Houston Office was the hub location for all business deals.

31. Each of the deals had their genesis in phone conversations and negotiations which occurred between Defendants and Finn while Finn was located in Houston, Texas. None of these deals would have taken place without Defendants seeking and obtaining Finn's approval from the Houston Office.

32. All bank accounts for Excel and WPEF were set up in Texas by Finn. Between May 2012 and February 2015, all of the payments made by Defendants on deals, (except one) were paid to the WPEF Bank of America account located in Houston Texas as instructed by Finn. There was one payment that Doyle paid on a deal in 2013 to Excel's Bank of America account in Houston Texas. At no time was any money ever delivered by Defendants to Excel in any State other than Texas.

33. Between May 2012 and February 2015, the average cost of the medical diagnostic equipment being bought or sold generally cost between $30,000.00 and $150,000 each depending on the type of diagnostic equipment and its condition. These were all used.

34. Between May 2012 and February 2015, Doyle and Medical Exporters wired funds to Excel and/or WPEF's Bank of America in Houston Texas at least 20 times. Each wiring of funds often included a net amount from several deals. There were occasions when Doyle would wire money from his personal account and other times Doyle would wire money from Medical Exporter's account.

35. Doyle advised Finn that between May 2012 and December 2014, that their business deals generated more than half of Doyle and Medical Exporter's business revenues.

36. Between May 2012 and February 2015, Defendants routinely contacted Finn in Texas, seeking to act as an intermediary to help sell Excel equipment for a small fee. There were numerous occasions when this happened.

37. Between May 2012 and February 2015, there were numerous deals, where Defendants found sellers of medical diagnostic equipment and contacted Finn at the Houston Office by phone or email to negotiate deals. They discussed the details of the deals, including the types of equipment available, the amount the seller wanted and other details. The medical diagnostic equipment was located in different states across the country, including Texas. After discussing, Finn would advise Defendants to negotiate to a certain price with the seller. After the seller agreed to the price, Defendants would contact Finn at the Houston Office on the phone or by email in Texas, advise Finn that the price was reached and sought confirmation. Permission to accept a deal was only given by Finn at the Houston Office. Defendants gave Finn wiring instructions and was wired from Houston Texas to Defendants, who would use the money to purchase the medical diagnostic equipment. In those instances, the wires would contain extra money that Doyle and Finn negotiated that Doyle and Medical Exporters would keep as compensation for handling the deal.

38. Between May 2012 and February 2015, there were also some deals, where Finn located sellers of medical diagnostic equipment, and discussed these possible deals with Doyle. In those instances where the deals went through, Doyle gave Finn wiring instructions and Finn wired money from accounts belonging to Excel and/or WPEF to Doyle and Medical Exporters, who would then go to brokers and buy the medical diagnostic equipment. In those instances, the wires would contain extra money that Doyle and Finn negotiated that Doyle and Medical Exporters would keep as compensation for handling the deal.

39. Between May 2012 and February 2015 there were at least 20 deals, where Doyle and Medical Exporters found or had buyers looking for medical diagnostic equipment. Doyle would contact Finn and and

ask whether the equipment sought could be obtained. Calls and emails were made by Doyle to Finn while Finn was at the Houston Office.

40. Prior to February 18, 2015 Excel trusted and confided in Doyle and Medical Exporters. There was a long standing substantial prior history of working together and Excel relied on Doyle and Medical Exporters in the past and trusted them with handling substantial funds that belonged to Excel and/or WPEF.

41. At all times, there was a relationship of trust and confidence between Excel and Defendants. Doyle and Medical Exporters owed Excel a fiduciary duty.

42. In or about March 2014, Doyle came to Houston Texas and met with Finn at the Houston Office to discuss business (the "March 2014 meeting").

43. At the March 2014 meeting, Doyle told Finn that Doyle and Medical Exporters had partnered up with a group of Texas investors located in Houston/Clear Lake Texas (the "Texas Finance Group") and that they were providing Doyle and Medical Exporters with a continuing and substantial line of credit and financing.

44. At the March 2014 meeting, Doyle said that Defendants had the ability to handle larger purchases due to the relationship with Texas Finance Group and that Doyle and Medical Exporters, together with the Texas Finance Group, purchased several PET/CT medical diagnostic equipment systems, including one system located in Texas. Doyle represented that Doyle and Medical Exporters were storing a PET/CT system in Schulenburg, Texas.

45. Doyle represented to Excel at the March 2014 meeting that Doyle and Medical Exporters were involved in discussions relating to acquiring diagnostic centers in San Antonio, Texas. Doyle also discussed acquiring lab equipment and open toxicology centers in Texas with Excel.

46. Later, the same day, Doyle advised Finn that Doyle met Henry Johnson, an officer in Freese Johnson who was involved in building urgent care centers on his flight from Houston. Doyle advised that

Freese Johnson builds First Choice Emergency Rooms and other facilities in Texas. Doyle forwarded Finn an email advising Finn of his meeting with Henry Johnson and later discussed possible investment opportunities with Freese Johnson.

47. In or about April 2014, Doyle contacted Finn about Excel buying a MRI system located in Lubbock, Texas. Doyle told Finn that the MRI system was located at Doyle's customer location and if Excel wanted to inspect it, that Doyle would have to be involved to "facilitate" such inspection.

48. In May 2014, Doyle asked Finn to purchase a "coach" located in Texas and Doyle and Medical Exporters bought the coach from Excel and delivered it to a company in California.

49. On December 28, 2014, Excel received an email from Doyle to the Houston Office (hereinafter referred to as the "December 28, 2014 email") advising that Doyle wanted Excel to refinance the 2008 Siemens Biograph 6 Truepoint with cardiac coach (the "2008 Siemens Coach") that was previously financed by the Texas Finance Group. Doyle wanted Excel to buy the "paper" allegedly owned by the Texas Finance Group on the 2008 Siemens Coach and Doyle was willing to pay on it monthly, plus interest and if Doyle was able to rent it, he was willing to split the net rental fee 50/50. Doyle also stated, "If we decide to sell it, I will split the proceeds 50/50". A copy of the December 28, 2014 email is attached hereto Marked Exhibit "1".

50. Additionally, Doyle represented to Excel in the December 28, 2014 email that Doyle and Medical Exporters had accounts receivables that could cover the 2008 Siemens Coach and had sold a cyclotron for $1.8 million against a transfer fee of $1.35 million. Doyle represented that the first 40% would be in on February 15, 2015. At no time material hereto did Doyle disclose to Finn any changes to these material facts. Doyle later represented to Finn that Doyle and Medical Exporters worked out their 2008 Siemens Coach issue.

51. In or about January 2015, Doyle contacted Finn in Houston saying that Doyle had a buyer, Siemens Medical Solutions USA ("Siemens") interested to buy certain equipment (the "Siemens equipment") owned by Excel.

9

52. Excel had for purchase the following Siemen equipment:

    a. Siemens 64 Slice CT Id# 400-341537;

    b. Siemens Symbia T6 Id# 400-321985; and

    c. Siemens Symbia S Id# 400-321984

53. At all times material hereto, there were numerous telephone conversations initiated by Doyle to Finn at the Houston Office relating to the Siemens equipment. Doyle represented to Excel in Houston that Siemens was willing to pay $375,000.00 for the Siemens equipment.

54. Finn and Doyle agreed in principal that Excel was willing to sell the Siemens equipment to Doyle and Medical Exporters for $363,000.000 conditioned on Doyle and Medical Exporters delivering these funds to the Houston Office. Doyle agreed.

55. However, unknown to Excel, Doyle and Medical Exporters were in a severe financial crisis with a cash flow problem that Doyle and Medical Exporters did not disclose to Excel. These financial problems were in sharp contrast to the representations given by Doyle to Finn.

56. Doyle and Medical Exporters had represented to Finn that Doyle and Medical Exporters would immediately pay $363,000.000 in full to Excel at the WPEF's Bank of America in Houston Texas immediately upon receipt of the payment by Siemens. Doyle and Medical Exporters had also represented to Finn that Doyle and Medical Exporters had the financial wherewithal, backing and assets to financially honor their oral and written agreements with Excel; had a credit line with the Texas Finance Group, and had sufficient assets and financial ability to pay.

57. However, upon information and belief, Doyle knew that both Doyle and Medical Exporters were in financial trouble and were in a cash flow bind. Upon information and belief, Doyle and Medical Exporters conspired, planned and schemed to get the Siemens equipment, get paid by Siemens and not remit all of the money to Excel.

58.     This was one of the largest medical diagnostic equipment deal that Doyle and Medical Exporters proposed to Excel. Doyle and Medical Exporters provided Excel with copies of the February 9, 2015 agreements between Siemens and Doyle and Medical Exporters.

59.     Doyle told Excel that Siemens insisted that prior to paying for the Siemens equipment, that the Siemens equipment needed to be delivered, tested and that payment would come shortly thereafter.

60.     Relying on the representations and promises made and their long relationship, Excel released the Siemens equipment to Doyle and Medical Exporters. This was prior to Excel being paid for the Siemens Equipment. The "gatekeeper" of the Siemens equipment was Finn, who was located in Houston Texas. Finn released the Siemens equipment to Doyle and Medical Exporters based on their misrepresentations and failures to disclose information.

61.     Doyle and Medical Exporters provided Excel with copies of the February 9, 2015 agreements between Siemens and Doyle and Medical Exporters.

62.     Excel prepared three "Equipment Purchase Agreements" and forwarded them to Doyle for signature. True and correct copies of the Equipment Purchase Agreements relating to the Siemens equipment are attached hereto, marked Exhibits "2", "3" and "4" and are incorporated herein.

63.     Doyle signed the Equipment Purchase Agreements and returned them to Excel in Texas. Finn told Doyle that Doyle was to wire the $363,000.00 to WPEF's account in Houston, Texas. Doyle agreed.

64.     The Siemens equipment was delivered and tested at Siemens locations. Siemens paid Defendants $375,000.00.

65.     However, Doyle and Medical Exporters failed to pay the $363,000.000 to Excel immediately after receiving the $375,000.00.

66.     Upon information and belief, Doyle and Medical Exporters never had an intention to pay as represented and agreed.

11

67. Upon information and belief, Defendants used the money paid by Siemens to pay the Texas Financing Group and/or others.

68. Excel made demand on Doyle and Medical Exporters for the monies owned.

69. On April 3, 2015, Doyle and Medical Exporters wired $150,000.00 to WPEF in Houston pursuant to the previous agreement between Doyle and Finn that the location for the performance of payment relating to the Siemens equipment was to be delivered and paid to the WPEF Bank of America account in Houston Texas.

70. On April 28, 2015, Doyle and Medical Exporters wired $25,000.00 to WPEF in Houston pursuant to that same agreement.

71. As was their course of doing business, Doyle and Medical Exporters forward payments to Excel in Texas.

72. Excel has tried to work with Doyle and Medical Exporters to get paid the balance of $188,000.00 but no payments have been made. Doyle admits to owing the money in an email dated June 28, 2015. A true and correct copy of the June 28, 2015 email from Doyle is attached hereto marked Exhibit "5".

73. On or about January 5, 2016, Doyle and Medical Exporters executed a letter agreement with Excel's Houston attorney Jim West. A true and correct copy of the January 5, 2016 between Doyle and Medical Exporters and Excel's attorney Jim West is attached hereto as Exhibit "6".

74. In the January 5, 2016 letter agreement, Doyle and Medical Exporters agreed to pay the balance of $188,000.00 in monthly payments of $10,000.00 beginning January 30, 2016. Doyle and Medical Exporters agreed to pay by check or money order payable to West Law Group, PLLC and mail it to West Law Group, PLLC's Houston Texas address, or alternatively to wire payment to the firm trust account in Houston.

75. Doyle and Medical Exporters have never made any payments pursuant to the January 5, 2016 letter and have made no other payments other than the initial $175,000.00.

## VIII. Causes of Action

### A.    Count 1- Breach of Contract

76.    Excel repeats and realleges the allegations of paragraphs 1 through 75 above as if set forth in full herein.

77.    Defendants have breached the oral agreements between Defendants and Excel by failing to pay Excel the full amount due to the Houston Office. Said breach is a proximate cause of damages sustained by Excel.

78.    Defendants have breached the three Equipment Purchase Agreements by failing to pay Excel the full amount due to the Houston Office. Said breach is a proximate cause of damages sustained by Excel.

79.    Additionally, and without waiving the foregoing, based on the course of dealings and conduct between Defendants, Excel and Finn, there existed an implied in fact contract that was breached by Defendants. Said breach is a proximate cause of damages sustained by Excel.

### B.    Count 2- Promissory Estoppel

80.    Excel repeats and realleges the allegations of paragraphs 1 through 75 above as if set forth in full herein.

81.    Additionally, and without waiving the foregoing, Defendants made numerous promises to Excel orally, in writing and/or that may be inferred from conduct (including Defendants silence). These promises were that Defendants would pay Excel for the Siemens equipment in a timely manner (and that the money would not be used for any other purpose).

82.    Excel reasonably and substantially relied on these promises made by Defendants to Excel's detriment.

83.    Excel would not have allowed Defendants to take possession of the Siemens equipment and/or be involved whatsoever but for these promises.

13

84. Excel's reliance was foreseeable by Defendants and injustice can be avoided only be enforcing Defendants promises. Said breach is a proximate cause of damages sustained by Excel.

C. **Count 3- Unjust Enrichment/Quantum Meruit**

85. Excel repeats and realleges the allegations of paragraphs 1 through 75 above as if set forth in full herein.

86. Alternatively, and without waiving the foregoing, Excel provided the Siemens equipment to Defendants and the Defendants accepted the Siemens equipment. Defendants had reasonable notice that Excel expected to be paid compensation for the Siemens equipment.

87. As a result of Excel providing the Siemens equipment to Defendants, the Defendants benefitted and accepted the benefit. Excel expected to be paid for the Siemens equipment but Defendants failed to do so.

88. Directly and by implication, Defendants agreed to pay a reasonable value for the Siemens equipment provided by Excel.

D. **Count 4- Declaratory Judgment**

89. Excel repeats and realleges the allegations of paragraphs 1 through 75 above as if set forth in full herein.

90. Excel seeks a Declaratory Judgment to have the Court declare and construe the agreements of the parties and declare that Defendants failed to perform under such agreements and are liable to the Excel under the Equipment Purchase Agreements.

E. **Count 5- Breach of Fiduciary Duty**

91. Excel repeats and realleges the allegations of paragraphs 1 through 90 above as if set forth in full herein.

92. At all times material hereto, Doyle and Medical Exporters owed Excel a fiduciary duty to disclose all material facts. Doyle and Medical Exporters had a duty to disclose all material facts because of

Doyle and Medical Exporters' special relationship of trust and confidence. At all times, Excel had placed trust and confidence in the integrity and fidelity of Doyle and Medical Exporters. Excel had trusted Doyle and Medical Exporters to administer, handle, safeguard funds and safeguard medical diagnostic equipment in numerous previous deals over a period of three years, and Excel was justified in expecting Doyle and Medical Exporters to act in Excel's best interest. Excel relied on Doyle and Medical Exporters.

93. Doyle and Medical Exporters' conduct is a breach of their duty of loyalty and utmost good faith; duty of fair honest dealing and breach of their duty of full disclosure. Such breaches resulted in injury to Excel and/or a benefit to Doyle and Medical Exporters because Defendants have kept the money paid to them by Seimens.

94. Doyle and Medical Exporters' failed to disclose to Excel that it was their intention not to pay Excel and instead keep all or a portion of the money from the sale of the Siemens equipment. Doyle and Medical Exporters failed to disclose that Defendants were in financial trouble and were in a cash flow bind.

F. **Count 6- Fraud, Fraud by Nondisclosure and Fraudulent inducement**

95. Excel repeats and realleges the allegations of paragraphs 1 through 94 above as if set forth in full herein.

96. Doyle and Medical Exporters made misstatements of fact which induced Excel to enter into certain agreements, transactions and to take certain actions. However, Doyle and Medical Exporters representations were false, misleading and deceptive. But for Doyle and Medical Exporters misrepresentations, Excel would not have taken action and/or would not have been involved with Doyle and Medical Exporters whatsoever.

97. Doyle and Medical Exporters' made misrepresentations of fact to Excel that Doyle and Medical Exporters would immediately pay $363,000.000 in full to Excel at the WPEF Bank of America account in Houston Texas immediately upon receipt of the payment by Siemens.

15

98.     These misrepresentations of fact were made by Doyle to Excel in numerous telephone calls between Doyle and Finn with many initiated by Doyle to Finn at the Houston Office. These numerous telephone calls occurred from the beginning when Doyle and Excel agreed in principal to this amount in or about January 2015. The misrepresentations continued in calls at the time Doyle requested that Excel allow the Siemens equipment to be released and prior to the time Doyle and Medical Exporters signed the three Equipment Purchase Agreements. Additionally, there were calls by Doyle to Finn after Siemens had the Siemens equipment.

99.     Doyle and Medical Exporters made misrepresentations of fact to Excel that Doyle and Medical Exporters had the financial wherewithal, backing and assets to financially honor their oral and written agreements with Excel, had a credit line with the Texas Finance Group, had sufficient assets and the financial ability to pay.

100.    These misrepresentations of fact were made by Doyle to Excel at the March 2014 Meeting, the December 28, 2014 email and in numerous telephone calls between Doyle and Finn with many initiated by Doyle to Finn at the Houston Office. These numerous telephone calls occurred from the beginning when Doyle and Finn agreed in principal to this amount in or about January 2015. The misrepresentations continued in calls at the time Doyle requested that Finn allow the Siemens equipment to be released and prior to the time Doyle and Medical Exporters signed the three Equipment Purchase Agreements. Additionally, there were calls by Doyle to Finn after Siemens had the Siemens equipment.

101.    Doyle and Medical Exporters committed fraud against Excel by making false representations of fact to Excel. At the time the material misrepresentations were made, Doyle and Medical Exporters knew they were false or were made recklessly without any knowledge of its truth and as a positive assertion. The representations were made with the intent that they would deceive Excel and be acted upon by Excel and/or cause Excel not to take action. Doyle and Medical Exporters' actions and conduct was designed to deceive

16

Excel. Excel acted and relied upon the representations of Doyle and Medical Exporters and as a proximate result has been damaged.

102. Additionally, Doyle and Medical Exporters' misrepresentations of fact as set forth herein to Excel constitute fraudulent inducement relating to Excel's release of the Siemens equipment and the execution of the three Equipment Purchase Agreements.

103. Doyle and Medical Exporters misrepresentations of fact as set forth herein also constitutes negligent misrepresentations and liability to Excel under the Restatement (Second) of Torts § 552. Defendants in their course of business, profession, employment and/or in the transactions, Defendants had pecuniary interest and supplied false information for the guidance of others, including Excel in its business transactions. Defendants are liable to Excel for Excel's losses caused by Excel's justifiable reliance upon such information. Defendants have failed to exercise reasonable care or competence in obtaining or communicating such information to Excel.

104. Additionally, and without waiving the foregoing, Doyle and Medical Exporters had a fiduciary duty and a special relationship requiring the disclosure all material facts. However, Doyle and Medical Exporters concealed facts and/or failed to disclose material information.

105. Defendants failed to disclose that Defendants were in financial distress, that Doyle and Medical Exporters were not going to pay $363,000.000 in full to Excel at the WPEF Bank of America account in Houston Texas, that Doyle and Medical Exporters did not have the financial wherewithal, backing and assets to financially honor their oral and written agreements with Excel, that the facts set forth in the December 28, 2014 email were not true, that Doyle and Medical Exporters did not have a credit line with the Texas Finance Group and did not have sufficient assets and the financial ability to pay.

106. Doyle and Medical Exporters failed to disclose material information to Excel and it was Doyle and Medical Exporters intention that Excel rely on the omissions and concealment so that Doyle and Medical

Exporters could take the Siemens equipment from Excel so that Doyle and Medical Exporters could make a substantial amount of money and not pay Excel and/or to use some of the Siemen money for their own business purposes and/or to pay debts owed to Texas Finance Group and/or others.

107. Upon information and belief, Doyle and Medical Exporters discovered new information that made earlier representations misleading or untrue and/or Doyle and Medical Exporters' voluntarily disclosure of information created a duty to disclose the whole truth. Doyle and Medical Exporters each had a duty to speak, yet remained silent and Doyle and Medical Exporters silence was equivalent to a false representation.

108. Upon information and belief, Doyle and Medical Exporters disclosed partial information, but failed to disclose the whole truth and failed to disclose new information that made the earlier representations misleading and/or untrue; and Doyle and Medical Exporters made partial disclosures of fact which conveyed a false impression.

109. Upon belief, at the time the Siemens equipment was taken, Doyle and Medical Exporters did not have a credit line with Texas Finance Group; were not able to borrow funds sufficient to cover the Siemens equipment; knew that the matters made the subject of the December 28, 2014 email were not true and/or no longer true; knew the matters discussed at the March 2014 Meeting were not true and/or no longer true; knew that Defendants were in financial distress and knew that Defendants were not going to pay Excel timely and in the amount and at the place of payment as previously represented.

110. At no time did Doyle and Medical Exporters correct these statements and representations.

111. Excel relied upon Doyle and Medical Exporters omissions and concealment and such nondisclosure caused injury to Excel.

112. As a direct result of such unlawful conduct and said Doyle and Medical Exporters conduct, Excel has been adversely affected and damaged.

**G**.   **Count 7- Constructive Trust**

18

113. Excel repeats and realleges the allegations of paragraphs 1 through 112 above as if set forth in full herein.

114. Excel seeks a constructive trust on all funds transferred by Defendants where Excel was the rightful owner or beneficiary of such funds. Without a constructive trust being imposed, there would be unjust enrichment.

## IX. Damages

115. As a direct and proximate result of Defendants' conduct, Excel suffered the following damages:

   a. Actual damages;
   b. Out of pocket damages;
   c. Benefit of the bargain damages;
   d. Lost profits; and
   e. The reasonable value of the Siemens equipment.

116. Excel is entitled to damages from Defendants, jointly and severally.

117. The actions of Defendants in inducing Excel to transfer the Siemens equipment to Defendants and selling the Siemens equipment without intending to pay Excel all of the funds at the Houston Office constitutes an intentional act, fraud, malice and/or gross negligence. Accordingly, Excel seeks exemplary damages against Doyle and Medical Exporters, jointly and severally.

118. Excel seek a constructive trust on proceeds, funds or property obtained as a result of the breach of fiduciary duty.

119. Excel also seeks attorneys fees, expert witness fees, costs for copies and depositions, court costs, prejudgment and post judgment interest.

## VIII. Prayer

WHEREFORE, PREMISES CONSIDERED, Excel requests the Court grant the relief requested herein, and that upon final hearing of this cause, that judgment be entered for Excel against Defendants, jointly and severally in an amount to be determined at trial, plus attorneys fees, court costs, pre and post

judgment interest at the maximum rate permitted by law and for such other and further relief, both at law and in equity to which Excel may show itself to be justly entitled.

Dated: February 3, 2017 	Respectfully submitted,

/s/ *Jeffrey Hunter Karchmer*
Jeffrey Hunter Karchmer
State Bar No. 11097710
Federal Bar No. 13632
3518 Travis, Suite 200
Houston, Texas 77002
(713) 850-8888
Fax: (832) 900-9535
jeff@karchmerlaw.com

Attorney in Charge for *Plaintiff Finn*
*as the assignee of Excel Imaging Services, L.L.C*

## CERTIFICATE OF SERVICE

On February 3, 2017, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, using the CM/ECF electronic filing system. I hereby certify that I have served counsel of record electronically or by other means authorized by the Court or the Federal Rules of Civil Procedure.

   /s/ Jeffrey H. Karchmer
Jeffrey H. Karchmer